Memorandum of Decision
On August 10, 1995, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Evelyn I. and Juan L. to their daughter, Joselyn L. Trial of this petition took place in September and November, 1996 before Judge Richard Dyer. During the trial, the mother consented to termination and judgment entered against her accordingly. Judge Dyer also determined that DCF had not proven statutory grounds for termination against the father and, on December 16, 1996, dismissed the petition against him. On June 10, 1998, DCF filed a second termination petition against the father. Trial of this petition took place on November 16, 17, and 18, 1998. For the reasons stated below, this Court grants the termination petition. CT Page 14252
FACTS
The Court finds the following facts and credits the following evidence. The Court relies heavily on Judge Dyer's findings with regard to events up until the time of his decision. See In reBrianna F., 50 Conn. App. 805, 817 (1998) (in a second termination proceeding, the court may consider "the findings of the first trial court.").[2]
The father was forty-two years old at the time of trial. He was born in Puerto Rico, dropped out of high school, and began working at the age of sixteen. He was married for a short time at age eighteen. This marriage did not produce any children. The father came to Connecticut in his early twenties. In about 1992, the father injured a leg and is now receiving a Social Security disability. He has had eight children through three different nonmarital relationships. His youngest child, Juan Miguel, who is about seventeen months old, currently lives at home with him.
Joselyn L. was born in Waterbury on November 6, 1991, and was seven years old at the time of trial. Because the mother was addicted to drugs, Joselyn was born with drugs in her system and displayed withdrawal symptoms after delivery. DCF did not immediately learn that Juan L. was the father. For these reasons, DCF obtained temporary custody of the child on November 14, 1991. The parents asked DCF to place Joselyn with an Hispanic family in Waterbury. When DCF was unable to find an appropriate family, the parties agreed to a placement with a non-Hispanic foster family in Kent who was willing to transport Joselyn to visits in Waterbury. Joselyn has remained with this family to this day.
On January 16, 1992, the court adjudicated Joselyn to be neglected and committed her to DCF for eighteen months. DCF has obtained regular extensions of the commitment thereafter. Originally, the father was allowed one hour of visitation per week at the Waterbury DCF office. In June, 1992, the father expressed an interest in being a placement resource for the child and DCF increased visitation to three hours per week. In January, 1993, DCF agreed that ninety minutes of the weekly visitation should take place at the father's home with the other ninety minutes remaining at the DCF office.
Pursuant to court-imposed expectations, DCF provided the father during this time a variety of services to improve his CT Page 14253 parenting skills. The home visits with Joselyn were supervised from February, 1993 to July, 1995 by a parent aid from the Families in Training agency. The father completed a parenting class but did not successfully complete a parent-child interaction program. The father also enrolled in a codependency counseling program, which was designed to help him stop supporting the mother's drug dependent lifestyle, but he failed to complete the program. DCF also asked the father to participate in an English as a second language program. Although the record is not clear concerning whether the father completed this program, the father was totally dependent on a Spanish-speaking interpreter during this trial.
In February, 1994, DCF, the foster parents, and the father agreed that a weekly third visit should take place at the foster home in Kent. The father, however, did not visit the foster home. The foster parents, who have had over thirty foster children over two decades, remained committed to transporting Joselyn to Waterbury to visit the father there. The foster parents also brought Spanish tapes, books, dolls, and Spanish-speaking persons into their home to help Joselyn develop a relationship with her father. Joselyn, as a result, knows many words in Spanish.
Despite these efforts by the foster parents, Joselyn began to resist going to visits and to have developmental setbacks at home. At the visits, Joselyn had to be coaxed to interact with the father. In June, 1994, Dr. Julia Ramos Grenier, a psychologist who has been involved in the case from 1992 to the present, noted that the father had improved his parenting skills but still did not interact fully with Joselyn. Dr. Grenier concluded that the father's parenting techniques "need to be put to the test through on-going, extended caretaking to see how well he is able to carry out parenting requirements on a more daily basis."
DCF accordingly agreed to seven hours of visitation per week in the father's home, which a DCF witness labeled an "extensive" visitation opportunity. This schedule remained in place from July 20, 1994 to October 5, 1994. At that time, DCF reinstated the prior three hour a week schedule because Joselyn was reacting negatively to the extended visits. On December 14, 1994, Dr. Grenier again evaluated the father and Joselyn, this time at the father's home. Dr. Grenier reported that the father showed much caring and affection for Joselyn but essentially followed her around the apartment rather than engaging in more parental CT Page 14254 activities such as reading or playing structured games. The evaluation noted that Joselyn had bonded with her foster parents and was showing significant emotional distress, not so much at seeing her father, but rather at the lack of stability and security that was generated by her status with him. Dr. Grenier concluded by recommending that parental rights be terminated and that the parties agree to an open adoption.
DCF filed for termination in August, 1995. In his decision on the failure to rehabilitate ground, Judge Dyer observed that the father "maintained consistent interest in Joselyn's welfare, demonstrated love and concern for the child, and made significant attempts to habilitate a relationship with her and improve his parenting skills during the period in question." Judge Dyer concluded that "although [the father] did not comply completely with each expectation, that failure does not lead the court to the belief that he could not, within a reasonable period of time, assume a responsible position in the child's life."
On the lack of ongoing relationship ground, Judge Dyer ruled that the case was similar to In re Valerie D., 223 Conn. 492
(1992), in which the Supreme Court held that the no ongoing relationship ground cannot apply when DCF files a coterminous petition and takes custody virtually upon the birth of the child.See id. at 532.[3] Judge Dyer also found that, although Joselyn saw her father more as a person to have fun with than a psychological father, Joselyn nonetheless had positive feelings about her father. For all those reasons, Judge Dyer dismissed the petition against the father.
In January, 1997, the Court set renewed expectations. The father was to complete another parenting skills program, which he did do. The father did not complete an additional codependency course in 1998 because he felt he no longer needed it. The visitation provision called for a third hour per week of visitation at the foster home in Kent. The father did not take advantage of this opportunity. The father did not visit Joselyn at all between December, 1996 and February 13, 1997, because he was in Puerto Rico visiting his mother, who was ill.[4]
Joselyn had continued to resist going to visits. Toward the middle part of 1997, Joselyn told her foster mother that she did not want visits with her father because he spoke Spanish and that, if she spoke to him in Spanish, she would say "Adios." On June 6, 1997, Joselyn went to the DCF office in Waterbury for a CT Page 14255 visit. When her father arrived, Joselyn cried, clung to her foster mother in a fetal position, and pulled away anytime her father made any attempt to get close to her. The father stated that he did not want to see his daughter upset and that he would not force her to visit if she did not want it. DCF accordingly ended visitation.
On June 17, 1997, Dr. Grenier conducted another evaluation of Joselyn and her father. Although Joselyn was initially reluctant to play with him, she eventually did, and the father appeared to be talking to her in English and eventually having fun with her. At the conclusion of the interaction, when Dr. Grenier asked Joselyn who she had been playing with, she originally replied a "monster," but then acknowledged that it was "Papi." Joselyn agreed that she liked to play with him but stated that she wanted to be with her Mama and Daddy, which meant her foster parents. Dr. Grenier observed that the father had made significant progress and tremendous strides in his emotional approach to the child. The psychological evaluation of the father revealed that the father did not show any serious psychopathology, although the father tended to be overly sensitive emotionally and could easily feel hurt by others at times. Dr. Grenier concluded that Joselyn was emotionally bonded to her foster parents and not to her natural father, whom she was rejecting. Dr. Grenier recommended that it would be detrimental to Joselyn's best interests to allow more visitation or further time to develop a relationship with her father and again called for termination with an open adoption. In court, Dr. Grenier explained that, although the father had improved his parenting skills, he had not done so in time for Joselyn to reciprocate.
On April 18, 1998, Dr. Rafael Mora de Jesús, a psychologist, conducted additional evaluations of Joselyn and the father. According to Dr. Mora, the father, although appropriately affectionate, lacked initiative with Joselyn and appeared uncomfortable in maintaining a conversation, providing a structured activity, or otherwise interacting with her. Among the various tests that Dr. Mora administered was the Parent-Child Relationship Inventory, which is a self-reporting test that measures a person's ability to be a parent based on a comparison with a representative sample of persons. This test revealed that the father has difficulty in recognizing the needs of children. He tends to view children as possessions and feels that the role of females in providing for the care of children should be greater than his own. As part of his clinical formulation, Dr. CT Page 14256 Mora found that the father had limited ability to deal with interpersonal situations generally. More specifically, the father did not fully comprehend the special needs for stability and nurturing that Joselyn would have if custody were transferred to him. Dr. Mora recommended termination of parental rights.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112(c)(1). The Court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. On November 9, 1998, the Superior Court for Juvenile Matters in Waterbury made the requisite finding that further efforts to reunify the parent and child are not appropriate.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112(c)(3). General Statutes § 17a-112(c)(3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the Court waives the one year requirement based on the standards set forth in § 17a-112(d).[5] In this adjudicatory phase, the Court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). The relevant date in this case is thus June 10, 1998.
DCF in this case has alleged the ground of failure to rehabilitate. DCF alleges that this ground has existed for more than one year. The Court finds that DCF has proven its allegations by clear and convincing evidence.
A failure to rehabilitate arises when "the parent of a child CT Page 14257 who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(C). No dispute exists that the Court has previously found Joselyn to have been neglected, thus satisfying a statutory prerequisite. The remainder of the statute requires the Court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'" In re Luis C.,210 Conn. 157, 167 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M.,49 Conn. App. 229, 240 (1998) (internal citation omitted).
This case is remarkably similar to In re Luis C.,210 Conn. 157 (1989). There the Supreme Court found sufficient evidence of failure to rehabilitate given findings that:
 the respondent [mother]'s visits with Luis were not productive toward maintaining or reinforcing a parent-child relationship, that Luis reacted negatively toward her, that the progress the respondent had in improving her parenting skills with respect to Luis was unpromising, that the prospects of the respondent achieving a useful and constructive role as a parent to Luis were critically impaired by language and cultural barriers, that Luis had psychologically bonded with his foster parents with whom he had lived for the last five years of his almost seven year life, and that the respondent continued to have difficulty in obtaining adequate housing.
Id. at 166. In the present case, as well, the respondent father, despite having improved his parenting skills, did not made sufficient progress during visits with Joselyn to inspire the belief that the relationship will grow closer.
In addition to the similarity of this case to Luis C., there are several other factors that strongly weigh in favor of termination. First, although Judge Dyer found some support for the failure to rehabilitate ground in the father's failure to comply with all expectations, he ultimately found insufficient evidence on the basis of the belief that the father could, CT Page 14258 "within a reasonable period of time, assume a responsible position in the child's life." A reasonable period of time has now elapsed. The father has had a second chance. He is still unable to engage Joselyn emotionally. Unlike the situation confronting Judge Dyer, there now is no basis to say that additional time will produce a different result.
Second, in the present case two psychologists concur in recommending termination. Courts are entitled to give great weight to such experts in parental termination cases. See In reChristina V., 38 Conn. App. 214, 221 (1995). Although Dr. Grenier thought that the father had tremendously improved his parenting skills but had just not done so in time given Joselyn's development, Dr. Mora believed that the father still had difficulty in recognizing the needs of children. In either case, the father has failed to achieve rehabilitation "as it relates to the needs of the particular child." In re Luis C.,210 Conn. at 167. See also In re Christina V., 38 Conn. App. at 219-221
(parent must not only rehabilitate as a person, but must rehabilitate as a parent).
There are many possible causes for the father's failure to rehabilitate. of primary importance is the fact that the father did not full take advantage of visitation opportunities, particularly those at the foster home. Visitation at the foster home may have helped the father overcome some of the cultural and linguistic barriers that undoubtedly existed here.[6]
In addition, although the father attended parenting classes, it is not clear how much he benefitted [benefited] from them. The father's personality also was such that he did not relate well to children generally and Joselyn in particular. Indeed, this case could be one in which there is simply a poor personality fit between the father and Joselyn.
The latter possibility raises the question of whether the termination statute encompasses unintentional failures to rehabilitate. The Supreme Court answered this very question inLuis C. There the Court stated that:
Under the failure to rehabilitate statute, however, the trial court's obligation is "not to make an unguided investigation of the respondent's `fault' in determining whether to grant a petition to terminate parental rights, any more than its disposition is intended to reflect some CT Page 14259 moral judgment respecting a parent whose rights are terminated. Nor may this court invalidate the statutory criteria of [17a-112(c)(3)(C)] merely because that criteria may in some instances implement the legislature's judgment that parental rights should be terminated despite the fact that a particular parent, with the best intentions, personally may be incapable of overcoming deficiencies in parenting skills."
In re Luis C., 210 Conn. at 168-69. For all these reasons, the Court finds that DCF has proven failure to rehabilitate by clear and convincing evidence.
DISPOSITION
In the dispositional phase of a termination case, the Court must consider whether the State has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(2). The Court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interests of Joselyn clearly and convincingly require termination of the parental rights of Juan L. Joselyn has been with her foster parents since birth. They have provided a wonderful home for her and she has prospered. Despite their bests efforts to have Joselyn get to know her natural father, and despite the father's improvement in his parenting skills, Joselyn has not bonded with her natural father. She is completely attached to her foster parents.
The Court does not intend to suggest that the father is not deserving of visitation. Visitation cannot be ordered by this Court once it terminates parental rights, but the Court can and does strongly encourage the foster parents to allow visitation by Juan L. This Court is "not prepared to assume that the welfare of children is best served by a narrow definition of those whom [it] permit[s] to continue to manifest their deep concern for [their] child[ren]'s growth and development." Michaud v. Wawruck,209 Conn. 407, 415 (1988). Based on the foster parents' enlightened approach to having their foster children learn of their biological roots, the Court is confident that the foster parents will follow the Court's recommendation in this regard.
In arriving at a decision, the Court must consider and make CT Page 14260 written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the Court finds that DCF provided foster care for Joselyn and offered Juan L. visitation. DCF referred Juan L. to counseling concerning parenting skills and codependency. These services were relevant to the needs of the parties and were offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the Court finds that DCF offered the father appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On March 26, 1997, the Court approved the following expectations for Juan L.: (1) cooperate with DCF, (2) visit Joselyn once a week at the DCF office and once a week in Kent, (3) attend a drug evaluation, (4) attend codependency and parenting counseling, (5) secure adequate housing, (6) have no involvement with the criminal justice system, and (7) sign medical releases. As detailed above, DCF substantially met its obligation to provide assistance. Based on the foregoing discussion, the Court finds that the father did not comply with the expectation that he visit Joselyn in Kent, complete a codependency program, or have no further involvement with the criminal justice system. The father complied with the other expectations.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant CT Page 14261 emotional ties. As stated above, Joselyn is bonded to her foster family. Joselyn is not bonded to her natural father.
5) The age of the child.
Joselyn is seven years old. Joselyn has lived her entire life in temporary foster care. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. See In re Juvenile Appeal (83-CD),189 Conn. 276, 292 (1983). The Appellate Court has observed that "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence in custody cases." Inre Alexander V., 25 Conn. App. 741, 748 (1992). Thus it is not in the best interests of the Joselyn to keep her in a foster care setting that is legally temporary. Joselyn is entitled to the permanency that termination provides.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the Court finds that, although Juan L. maintained fairly regular contact with Joselyn, Juan L. has not been successful in the efforts he has made to adjust his circumstances or conditions to facilitate reunification.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
The Court does not find any third party interference, economic circumstances, or other identifiable factors that prevented Juan L. from maintaining a meaningful relationship with Joselyn.
CONCLUSION
CT Page 14262
Based upon the foregoing findings, the Court determines that it is in the best interest of Joselyn L. for a termination of parental rights to enter with respect to the father, Juan L. Accordingly, the Court hereby terminates all parental rights. The Court further orders that the Commissioner of DCF is appointed statutory parent for Josleyn for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the Court's direction that they receive first consideration. The Court also strongly encourages the foster parents to permit contact and visitation by Juan L. The Commissioner shall file with this Court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman Judge, Superior Court
[2] The Appellate Court has also stated, however, that a court's decision that a ground for termination did not exist at one time does not preclude such ground from arising at a later time. See In re Brianna F., 50 Conn. App. at 816, 818;In re John B., 20 Conn. App. 725, 730 (1990).
[3] Although the present case differs in that here DCF filed the second termination petition almost four years after the birth of the child, DCF has not renewed the lack of ongoing relationship ground in this case.
[4] Another expectation was to have no further involvement with the criminal justice system. The father had at least four misdemeanor convictions between 1990 and 1993. He also admitted to purchasing illegal drugs for the mother during this time period. In 1996, the father was arrested for a domestic violence incident. In June, 1997, the father was charged with driving without a license. On September 29, 1997, the father was arrested again and ultimately charged with failure to appear. Although there is no record of any convictions from the 1996 and 1997 charges, and in fact the failure to appear was nolled, the Court in termination cases is allowed to consider mere arrests. See Inre Helen B., 50 Conn. App. 818, 828-29 (1998). This approach seems especially valid when, as here, there is more than one CT Page 14263 arrest and the Court has specifically set as an expectation that there be no involvement with the criminal justice system.
[5] Effective July 1, 1998, section 8 of Public Act No. 98-241
eliminates the one year requirement. DCF does not claim reliance on this amendment, apparently because of concerns that a substantive change in the law should not apply retroactively to a petition, such as the petition here, filed before the effective date of the new law.
[6] Here, as in Luis C., "[w]hile placement within the extended family or in an Hispanic foster home might have been better than use of [a] non-Hispanic foster home, those alternative options have not been available." 210 Conn. at 168.